# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO 06-313 (RWR) |
| | : | |
| | : | |
| | : | Date:  10/5/07 |
| v. | : | Time:  10:00 a.m. |
| | : | Dept:  Roberts |
| ROBERT DELGADO, | : | |
| | : | UNDER SEAL |
| Defendant. | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

### INTRODUCTION

Defendant Robert Delgado appears before the Court for sentencing following his plea to violations of 18 USC 286 and 18 USC 1341. While both the Statement of the Offense, submitted by the defendant at the time of his plea, and the factual summary contained in the PSR are accurate, they do not provide the Court with a complete explanation of "the nature and circumstances of the offense." (18 USC 3553(a)(1)). Defendant submits this sentencing memorandum to cure that deficiency and speak to several other issues.

### NATURE AND CIRCUMSTANCES OF THE OFFENSE

Starting in approximately 1997, Robert Delgado was the sole proprietor of Global Resources Group, a company that serviced orders from Philippine companies for American goods. Delgado had previous export experience working with other companies. Up until the events involved in this case, typical orders through GRG were from $500.00 to $20,000. The largest order he had completed was for approximately $75,000.

In approximately June of 2000, Delgado was contacted by an old friend in the Philippines, Jose Ramon Garcia - a man he knew as "Monchu" - who had been the best man at

Delgado's wedding. Monchu was known by Delgado to own a company in the Philippines named Orient Freight that was in the container shipping business. Monchu told Delgado that he had a friend with a large export need and asked Delgado if he was interested. Delgado said yes.

Delgado was then contacted by a person who identified himself as Peter Angliongto. Angliongto at that time said he wanted to order in the neighborhood of $5 million in American goods. Delgado was not at all sure he could service such a large order. He felt such an order could take up to a year to fulfill in its entirety, would require partial shipments, and he would need up to a six month extension on any line of credit from the purchaser. His feelings were reinforced after receiving a list of goods to be purchased from Anglioto. In response to his concerns, Monchu and Angliongto assured him they would amend the letter of credit to allow partial shipments and they would extend the expiry date of the letter of credit. Delgado understood that these requests would originate from the beneficiary of the loan in Manila and relayed bank to bank. Delgado assumed that he would receive a copy of the amendment allowing both requested items from First Interstate Bank.

Delgado was not familiar with the Exim bank and thought it was simply a regular bank. Angliongto fostered that impression. As Delgado began analyzing the list of items to be exported to determine both pricing and availability, Anglioto suggested an alternative. In an email sent on August 20, 2000, Angliongto stated:

> I just spoke with EXIM and I'll need to send a PO this week. Regardless of the actual pricing, can we agree on what will be stated for exim bank documentation. The actual price on the machines and even if they will be shiped [sic] out in reality or not is one thing, the real order another. We should already agree on what we will show EXIM for documentation purposes the other part (the actual goods to be ordered) will be between us and will actually be simpler. . . .

Delgado was reluctant to proceed in the manner Angliongto suggested and told him so. Angliongto insisted that this was simply the way these large orders were handled, and told Delgado he would have someone from the Exim bank contact him.

Shortly thereafter, Delgado got a call from a woman who identified herself as Bonnie

Balderama. She said she was the country manager in the Philippines for the Exim bank, that she was calling from the Philippines, and she understood Delgado had some questions about procedures. Delgado told her that Angliongto's plan to provide the purchaser with loan funds to purchase goods from overseas did not sound right, and Balderama replied that this was standard operating procedure and it was done every day. She said that Angliongto had time constraints and schedules to meet, and that Delgado's plan to get a nine to ten month extension to fill the entire order would not work; it would be much better to simply send the money. She sent Delgado a generic Exim bank loan agreement for him to review, although, as he later learned, it was missing pages that would be significant to him.

Delgado felt somewhat relieved based on his call with Balderama, and he continued to work toward trying to complete the order. However, he then had contact with First Interstate Bank who would be funding the Exim loan, and he learned that Balderama had given him incorrect information. Specifically, he learned that the content of the shipment had to be American goods purchased in the United States and that he would have to certify that the shipment had been made before funds could be released. He reminded Angliongto of their previous agreement regarding partial shipments and extensions on a line of credit, but Angliongto told him to simply send the money that would be released with the loans.

After many weeks of discussion, Delgado told Angliongto that he had decided to go forward with the loan but to keep the funds released in his account, shipping items ordered when they were ready to be shipped whether or not Angliongto wanted him to do so. (Many of the items listed were not stock items and some carried as much as a five month delay from order to production.) Shortly thereafter, Delgado got a call from Monchu, telling him that he was making things worse than they needed to be, that he was affecting a lot of important people, and that he should simply trust that this is the way things were done. Delgado then got a call from Balderama, who insisted the same, telling him that he was worrying over the small print that no one paid attention to. She also stressed that his position was affecting a lot of people, and that he

really didn't know "who he was dealing with."

Shortly after that, Delgado got a series of anonymous calls in the middle of the night. The first caller was a woman who said that the project Delgado was working on was very important, and he needed to have the funds that Angl1ongto needed to be released as soon as possible. The second caller was a man who spoke in Tagalog. He said that Delgado's brother (who was living in the Philippines) likes discos and he was in fact in a particular one just last night. He told Delgado to follow through on his deal with Angliongto or else he would turn Delgado's brother's stomach into a faucet. The third caller was again a woman asking that he facilitate Angiongto's deal. Delgado hung up on the third call before it was completed.

Delgado took seriously the threat to his brother's life. In 1968, his father's cousin was killed, apparently for staring at a person who was a policeman or a military bodyguard. In 1972, his father's brother was assassinated by Philippine cadets, apparently for talking to a girl that used to date one of the soldiers. A family friend was kidnapped and held for ransom; after a negotiator thought he had arranged a reduced ransom, the friend was never heard from again. Unsolved killings and assassinations, often committed by the police or the military, are common in the Philippines. (See, e.g., CNN news report of Sept. 6, 2007, on political killings in the Philippines; one report estimated 900 political killings in recent years.)

While there were undoubtedly a number of actions Delgado could have taken at that time, he chose to accede to the demands and go through with the loan procedure. Of total loan proceeds of 2.1369 million dollars, Delgado forwarded 1.6 million directly to Angliongto. He initially shipped approximately $175,000 worth of product to the Philippines before the loan was funded. Even after releasing funds to Angliongton, Delgado continued to try to obtain goods to export to the Philippines even as Angliongto insisted he wanted the balance of the money. Delgado later shipped additional product to the Philippines along with $100,000 more cash to Angliongto. He kept approximately $100,000 for his fee (which sum was repaid in lieu of forfeiture at the time of his plea in this case).

## HISTORY AND CHARACTERISTICS OF DEFENDANT

As is evident from the PSR, Robert Delgado not only has no prior or subsequent criminal history but has otherwise lived a positive and constructive life which has included both a regular work history and involvement in community activities. What is not evident from the report is how profoundly his involvement in this affair impacted his life before charges were ever filed.

Delgado remained fearful of Angliongto and people working with him in the Philippines. He concluded that if he went to the Philippines, either to visit family or advance the business interests of Global Resources Group, he might be killed. His fear was such that he did not go to attend his grandmother's funeral in the Philippines, a lapse that bothers him to this day. Within a year, he lost seven legitimate, longstanding clients and he was forced to close his business.

In 2001 Delgado began experiencing anxiety attacks which led to what amounted to a nervous breakdown in 2002. He was medicated with some adverse side effects and went through therapy throughout 2003. For a period of time he was unable to work. He had a recurrence in 2006 and is currently taking Lexapro for anxiety.

From the time Delgado was first contacted by law enforcement in this case, he has been cooperative both in disclosing his own involvement as well as others in this case. He has met with government counsel three times and has provided all documents in his possession relevant to the government's investigation. He has agreed to testify before a grand jury or at a trial if requested to do so. To date, no such request has been made.

The government has informed counsel that Delgado has not provided substantial assistance in this case pursuant to U.S.S.G. § 5k1.1. In my view, this is only because Mr. Delgado's knowledge was limited, not because of any lack of desire on his part to be cooperative. Indeed, Mr. Delgado feels great remorse for his conduct (in his shame, he has only disclosed his present legal circumstances to a small group of people) and wants to do anything within his power to make amends for it. He also feels that he was tricked and used by a former close friend (Monchu) and his associates (Angliongto and Balderama), who took advantage of his naivety and

inexperience. Indeed, Delgado actually believed that Angliongto would faithfully make loan payments on the loan from First Interstate Bank and did not realize that the bank could look to him for recourse in the event of default. He would therefore like to assist the government in bringing them to justice as well.

In considering these factors pursuant to 18 USC §3553(a)(1), the Court should also consider them as they apply to sections (a)(2)(C). Specifically, there is every reason to believe that this event was an aberrant one in the defendant's life, and that he poses no risk whatsoever of future illegal behavior.

## CONCLUSION

The government has represented to counsel that this particular prosecution is one piece of a large prosecution involving many other defendants and many other incidents. Taking the government's representatives at their word, and I do, this Court will have a context and perspective on this case as it fits into the larger whole that I lack. I cannot compare Mr Delgado's offense and circumstances with others involved in related offenses as it may apply to sentence disparities.

With that caveat, the application of the statutory sentencing principles in this case demonstrate that a sentence within the advisory guideline range in this case is extreme and manifestly unjust. Mr. Delgado initially entered into what he believed was a legitimate and entirely legal business relationship. It was not his intention to cooperate in a fraudulent scheme, but he was, candidly, in over his head. In fact, his risk and exposure vastly exceeded any benefit he could have hoped to derive from his participation. He was cajoled, manipulated, and then threatened to carry out his role in the offense. In choosing the path of least resistance, he acted voluntarily, but not willingly. He extracted a small profit from his participation, but he has returned that money to the government. Since being contacted by law enforcement, he has done everything in his power to make amends for his conduct.

Robert Delgado is surely among the least culpable of fraud defendants in this or any other case. Probation would be appropriate in this case were it not precluded by the categorization of 18 USC §1341 as a class B felony. However, the Court could, and should, impose a minimal term of imprisonment followed by an extended term of supervised release which could include a term of home detention.

Respectfully submitted,

Dated: October 1, 2007

MICHAEL P. THORMAN
Bonjour, Thorman, Baray & Billingsley
Attorney for Defendant
*Pro Hac Vice*
Cal. State Bar #63008
24301 Southland Dr. Ste 312
Hayward, CA 94545
(510) 785-8400

Dated: October 1, 2007

Kevin C. Robertson
Brennwald & Robertson, LLP
922 Pennsylvania Ave., SE
Washington, DC 20003

1

**PROOF OF SERVICE**

2

I, Dawn M. Fraley, declare that:

3

4     I am a resident of the State of California and over the age of eighteen years, and not
      a party to the within action; my business address is 24301 Southland Drive, #312, Hayward,
5     California 94545.

6     On October 1, 2007, I caused to be served the within document(s):

7

**DEFENDANT'S SENTENCING MEMORANDUM**

8

    X              by transmitting via facsimile the above listed document(s) to the fax number
9                          set forth below on this date before 5:00 p.m.

10    _____        by placing the document(s) listed above in a sealed envelope with postage
                           thereon fully prepaid, in the United States mail at Hayward, California
11                         address(es) as set forth below.

12    _____        by hand delivery

13

14    MICHAEL K. ATKINSON                 HANK BOND WALTHER
      Assistant U.S. Attorney                    Fraud Section, Criminal Division
      555 4th St., N.W.                         U.S. Department of Justice
15    Washington, D.C.                        1400 New York Ave., NW
      (202) 616-3702                         Washington, D.C.  20005
16                                            (202) 257-6176

17    I am readily familiar with the firm's practice of collection and processing correspondence
      for mailing.  Under that practice it would be deposited within the U.S. postal service on that
18    same day with postage thereon fully prepaid in the ordinary course of business.

19    I declare under penalty of perjury under the laws of the State of California that the above is
      true and correct.  Executed on October 1, 2007, at Hayward, California.

20

21    _Dawn M. Fraley_
      Dawn M. Fraley

22

23

24

25

26

27

28